Alan D. Halperin, Esq.
Robert D. Raicht, Esq.
Julie D. Dyas, Esq.
**HALPERIN BATTAGLIA RAICHT, LLP**
Proposed Counsel to the
 Debtors and Debtors-in-Possession
555 Madison Avenue, 9th Floor
New York, New York 10022
(212) 765-9100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 09-15478 (JMP) |
| **TANA SEYBERT LLC, <u>et al.</u>,** | |
| Debtors. | (Jointly Administered) |

-------------------------------------------------------x

**MOTION FOR ORDERS (I) SCHEDULING HEARING TO
CONSIDER SALE OF CERTAIN OF THE DEBTORS'
ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS AND
ENCUMBRANCES, SUBJECT TO HIGHER AND BETTER OFFERS;
AND; (II) SCHEDULING HEARING TO CONSIDER
APPROVAL OF (A) BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (B) BIDDING
PROCEDURES FOR THE CONDUCT OF AN AUCTION AND
ENTERING ORDER THEREON; (III) FIXING MANNER AND NOTICE
OF SALE HEARING; (IV) AUTHORIZING THE DEBTORS TO SELL
ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS AND
<u>ENCUMBRANCES, SUBJECT TO HIGHER AND BETTER OFFERS</u>**

TO THE HONORABLE UNITED STATES
BANKRUPTCY JUDGE IN THESE PROCEEDINGS:

Tana Seybert LLC ("<u>Tana Seybert</u>"), Cousins Printing LLC ("<u>Cousins</u>"), Creative Print Services LLC ("<u>CPS</u>"), and Printelligence, LLC ("<u>Printelligence</u>"), the debtors and debtors-in-possession herein (collectively, the "<u>Debtors</u>"), by their proposed counsel, Halperin Battaglia Raicht, LLP, makes this motion (the "<u>Motion</u>"), pursuant to sections 105 and 363 of Title 11 of the United States Code, as amended (the "<u>Bankruptcy Code</u>"), for entry of orders:

1. fixing the date and time of a hearing (the "<u>Sale Hearing</u>") to consider approval of a certain asset purchase and sale agreement and all ancillary transaction documents (collectively, the "<u>Sale Agreement</u>" attached hereto as **Exhibit A**) by and between certain of the Debtors and Unimac Tana Seybert LLC (the "<u>Purchaser</u>"), dated as of September 10, 2009, pursuant to which the Debtors propose to sell certain designated (the "<u>Assets</u>"), free and clear of all liens, claims and encumbrances, subject to higher or better offers,

2. fixing the date and time of a hearing (the "<u>Bidding Procedures Hearing</u>") to consider approval of a break-up fee (the "<u>Break-Up Fee</u>"), the expense reimbursement (the "<u>Expense Reimbursement</u>"), and bidding procedures (the "<u>Bidding Procedures</u>") to be utilized in connection with the Auction of the Assets to be held prior to the Sale Hearing (the "<u>Auction</u>"),

3. fixing the manner and form of notice of the Sale Hearing, and

4. approving the Sale Agreement and authorizing the sale of the Assets pursuant to section 363(b) of the Bankruptcy Code and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), free and clear of claims, liens and other encumbrances.

In support thereof, the Debtors respectfully represent, as follows:

## **INTRODUCTION**

1. By this Motion, the Debtors seek entry of an Order approving the sale of the Assets, free and clear of all liens, claims and encumbrances (the "<u>Asset Sale</u>"). The Debtors have received an offer from the Purchaser to purchase the Assets (the "<u>Offer</u>").

2. The proposed sale under the Offer shall be subject to higher and better offers that may be made at the Auction to be scheduled prior to the Sale Hearing, provided that a Qualified Bid (as defined herein) is received pursuant to the Bidding Procedures (as described herein). For the reasons set forth herein, the Debtors request that the Court approve a Break-Up Fee, together with an Expense Reimbursement and establish Bidding Procedures for the conduct of the Auction. The proposed sale is the result of substantial good faith, arms' length negotiation and provides a vehicle for the Debtors to maximize asset values through an auction sale process. Accordingly, the Debtors respectfully request that the Court schedule the Sale Hearing and grant the other forms of preliminary relief requested in accordance with the pre-fixed order scheduling hearing.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). The statutory predicates for the relief sought herein are sections 105(a), 363(b), (f), (m) and (n) of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004 and 9014. Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. §157(b). Venue is proper before this Court pursuant to 28 U.S.C. §1409.

## BACKGROUND

4. On September 11, 2009 (the "Petition Date"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code and have continued in the management and operation of their business and property as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

5. No committee or trustee has been appointed in the Debtors' Chapter 11 cases.

6. The Debtors are limited liability companies organized and existing under the laws of the State of Delaware. Tana Seybert holds all or a majority of the membership interests of the other Debtors, as well as other non-Debtor entities. The membership interests of Tana Seybert, in turn, are owned fifty percent (50%) by Jurist Family Associates and fifty percent (50%) by Seybert Nicholas Printing Group, LP.

7. The Debtors are a one-stop, full spectrum service provider for printing and other graphic communications services, including out-of-home or specialty production, retouching, and/or creative development. The Debtors are the largest Manhattan-based, vertically-integrated graphic communications vendor and provide a full array of services under one roof, servicing clients in a broad range of industries: Advertising, Cosmetics, Entertainment, Financial Services, Healthcare, Not-For-Profit, Pharmaceuticals, and others. In 2007, the Debtors' gross revenues aggregated over $70 million and in

2008 they aggregated $67 million. The Debtors' revenues in 2009 through July 31st are approximately $29 million.

8. Currently, the Debtors' operate from a leased seven-story Manhattan facility located at 525 West 52nd Street, New York, New York, 10019 and offer services from multiple sheetfed and digital presses, as well as provide customers with in-house access to a full bindery, mailing and fulfillment services. The Debtors also offer both web and sheetfed printing services from their leased 50,000 square-foot plant located at 270 Sheffield Street, Mountainside, New Jersey 07092.

9. The Debtors originated in New York City at a time that predates the completion of the Woolworth Building in 1913. The Debtors' predecessor witnessed the Great Depression, two world wars, the eight-track tape, and terabyte desktop hard drives. They originated when Broadway was lit by gaslight, and evolved into a digitally driven graphic communications resource for some of the country's top firms.

10. The Debtors' modern business structure was formed through a merger in 2004, pursuant to which two legendary New York City printing firms—Tanagraphics and Seybert Nicholas – combined to form Tana Seybert. The businesses were a natural match as technology was already impacting the profitability of commercial printers, and combination and cost savings appeared intrinsically logical. As both companies had complimentary businesses, the goal was to achieve a combined business with a value equal to more than the sum of their individual businesses.

11. The Debtors' financial difficulties stem from a confluence of events. Like many industries, the printing industry, including the Debtors, has been severely affected by the global economic downturn over the last 18 months. Bear Stearns, Lehman Brothers and many other hard hit financial companies were among the Debtors' largest customers. Unfortunately, the Debtors' financial position has eroded more than many other business areas as customer advertising budgets, including print advertising, are among the first areas of cost cutting in any economic downturn. Given the duration and depth of the

current recession, the efforts of management to sustain operations under their current structure have been unavailing.

12. Additionally, independent of the general economic downturn, the printing industry is facing its own inherent difficulties due to changes in technology and the economic advantages of global outsourcing. With respect to changes in technology, the internet has provided an alternative promotional method for the Debtors' clients, often at more attractive cost bases. The rampant growth and availability of electronic print media has adversely affected much of the publishing industry, including demand for hard print media -- the core of the Debtors' business operations. Though certainly significant print media remains, in addition to the economic downturn and the growth of electronic media, the publishing industry now faces stiffer competition overseas for both inventory and labor. The Debtors collectively employ approximately 240 union and non-union employees. In contrast to outsourced labor, a large portion of the Debtors' manufacturing force consists of employees represented by one of two labor unions entitling workers to benefits that substantially increase the Debtors' manufacturing overhead. These and other challenges have directly resulted in the Debtors' need to seek protection under Chapter 11.

13. To fund their operations pending the Asset Sale, simultaneously herewith, the Debtors are also seeking approval of the terms of a consensual cash collateral facility with HSBC Bank USA, N.A. ("HSBC"), their pre-petition lender, which asserts a claim of approximately $9.5 million, secured by liens in substantially all of the Debtors' assets.

14. In addition to the cash collateral facility, the Debtors are also seeking approval of an Interim Production Support Agreement (the "IPSA") to assist the Debtors in fulfilling customer orders if and to the extent there is insufficient availability under the cash collateral facility to do so or otherwise cannot or do not believe it is in the best interests of the estates to perform. The cash collateral facility combined with the IPSA are designed to enable the Debtors to ensure continuity of service to their valuable customer base, thus maximizing asset values for the benefit of their creditors and estates.

15. By seeking bankruptcy protection, the Debtors will be able to protect and preserve their assets and businesses for the benefit of their creditors and employees.  These proceedings will enable the Debtors to transition their business to a financially sound purchaser, maximize the value of the Debtors' strong goodwill in the print industry, provide employment to many of their valued employees, and sustain a significant and trusted trading partner for their customer base.  In addition, through the Chapter 11 process, the Debtors will be able to maximize the value of their other assets for the benefit of the estates and their creditors.

## MARKETING THE ASSETS FOR SALE

16. Prior to the Petition Date, the Debtors pursued various avenues to enable the businesses to continue in operation in an effort to protect, preserve and maximize the value of their assets. These efforts have including attempts to identify a strategic investor for the businesses and/or an acquirer for all or a portion of the assets.  Within the past year, the Debtors' management team prepared financial and operational materials for dissemination to potential investors and/or acquirers of all or a portion of the Debtors' assets and/or businesses and engaged an investment banking firm to assist in their review of materials and marketing efforts.  Over a period of several months, the Debtors solicited expressions of interest from approximate forty-five (45) candidates, including strategic buyers, private equity firms and offshore strategic buyers and investors.  Unfortunately, none of the parties made a definitive offer that would enable the Debtors to reorganize on a stand-alone basis.

17. The Debtors, through their current management consultant and financial advisor, Getzler Henrich & Associates LLC ("Getzler Henrich"), have updated their financial and operational materials and intend to solicit offers for the Assets from parties previously solicited as well as up to another 100 parties that the Debtors' financial advisors believe may have an interest in acquiring the Assets.  The Debtors submit that - - with the Offer from the Purchaser and the Debtors' ability to transfer the Assets free

and clear of liens, claims and encumbrances pursuant to an Order of the Bankruptcy Court -- there is a potential for a competitive bidding process for the Assets.

18. To date, Purchaser is the only party to make a formal written Offer to acquire certain of the Debtors' assets and businesses on a going concern basis. Purchaser is a printing company that offers services for outdoor advertising, point of purchase displays, in-store signing, direct mail components, pharmaceutical and healthcare inserts, catalogs, and hang tags. It is based in Carlstadt, New Jersey. The Debtors believe that the Offer is fair and reasonable - - although it intends to submit the Offer to the rigors of the marketplace. The Offer has been memorialized in the Sale Agreement for which the Debtors now seek approval.

## THE SALE AGREEMENT

19. The Sale Agreement is a comprehensive, purchase and sale agreement setting forth all the rights and obligations contemplated thereunder by and between the Debtors and the Purchaser. The Sale Agreement provides a vehicle for the disposition of certain of the Debtors' operating assets and, at the same time, enables the Debtors to canvass the marketplace for any higher and better offers for the Assets.

20. The following is a general explanation of the salient terms of the Sale Agreement. Capitalized terms not defined herein shall have the meanings ascribed to them in the Sale Agreement:[1]

> Purchased Assets: The Sale Agreement contemplates the Debtors will sell, convey, assign and transfer to Purchaser all of the Assets (other than the Excluded Assets) on the terms and subject to the conditions set forth in the Sale Agreement, consisting of (a) the Tradenames, the Customer Lists, the MIS Software, the Graphics Files, the Hardware and the Approved Vendor Terms (collectively, the "Core Assets"), (b) the New York Assets, (c) the New Jersey Assets, (d) the Mailing Equipment, and (e) Paper Assets (all as defined in the Sale Agreement). The sale of the Assets will be free and clear of all claims, liens and other encumbrances.

---

[1] The following is merely a summary of the Sale Agreement and is qualified in its entirety by the actual, express terms of the Sale Agreement. To the extent there is any discrepancy between this summary and the terms of the Sale Agreement, the terms of the Sale Agreement shall control.

Excluded Assets: The Debtors are not selling to the Purchaser and the Assets do not include, among other things, (a) cash or cash equivalents, (b) accounts receivable, or (c) any avoidance claims and actions of the Debtors under sections 544, 545 and 547 through and including 551 of the Bankruptcy Code.

Purchase Price: The purchase price for the Assets is cash in the aggregate amount of $679,510, plus 70% of cost of usable paper stock on hand (as currently quoted by Lindenmeyer Paper) (collectively, the "Purchase Price").

Record Retention: The parties will take steps to preserve and keep records related to the Assets for a period following the closing of the transaction.

Conditions: The conditions to closing are set forth in Article 9 of the Sale Agreement. They include, among other things, (a) the accuracy of representations and warranties of the Parties as of the Closing Date, (b) no order by a governmental authority enjoining the consummation of the transactions contemplated by the Sale Agreement, (c) no material adverse change, and (d) entry of an order by the Bankruptcy Court authorizing the sale of the Assets to Purchaser, in accordance with the terms of the Sale Agreement.

No Assumed Liabilities: Except as provided in the Sale Agreement, the Purchaser is not acquiring any debts or obligations of the Debtors.

## ADDITIONAL DISCLOSURES REGARDING RELATED TRANSACTIONS

21. Subject to Closing on the Sale Agreement with Purchaser, Purchaser intends to hire approximately 42 of the Debtors' salesforce, 16 of their administrative staff and 25 of their manufacturing personnel. In addition, Purchaser has offered employment or consulting arrangements (collectively, the "Employment Agreements") to five (5) of the Debtors' insiders: Eric Bernstein, James Nicholas, David Jurist, Alice Jurist and Gerry Ritterman. The term and compensation under the Employment Agreements such arrangements are entirely subject to future achievement of certain net revenue benchmarks. The Employment Agreements are terminable by the Purchaser in the event net revenue benchmarks of $5,000,000, $20,000,000, and $25,000,000 are not achieved by the Debtors' sales force within 6 months, 1 year and 2 years, respectively, after Closing. The Employment Agreements contemplate base salary[2] and potential bonus payments to certain of the Debtors' insiders,[3] and the

---

[2] Subject to termination for failure to achieve the stated net revenue benchmark, the Employment Agreements contemplate base salaries to the Debtors' principals, as follows: James Nicholas - $250,000, David Jurist - $250,000, Alice Jurist - $150,000 (draw against commission), Eric Bernstein - $250,000 and Gerry Ritterman - $52,000.

Debtors' principals will be subject to restrictive covenants regarding confidentiality and solicitation of customers and other competition with Purchaser.

22. Unrelated to the Debtors' businesses and/or the Asset Sale, in or about late 2007, a personal loan was made to a principal of the Debtors by an individual, in his individual capacity and out of personal funds, who is also affiliated with Union Graphics, Inc.[4] The loan, in the original amount of $250,000, was substantially undocumented and has been substantially satisfied. The loan was personal in nature and occurred prior to any of the pre-petition marketing efforts undertaken by the Debtors to identify new investors and/or effect a sale of the businesses. For the avoidance of doubt, to the extent any obligations under the loan remain unsatisfied, such obligations are, and will remain, independent of, and unaltered by, the Asset Sale and/or the Transaction Documents for which the Debtors seek approval by this Motion.

## DISPOSITION OF OTHER ESTATE ASSETS

23. As noted above, the Assets for sale do not include, among other things, the Debtors' accounts receivable, which as of the Petition Date aggregate approximately $10 million (including work completed but not billed and WIP) (the "Receivables"). During the pendency of the Chapter 11 cases, the Debtors will endeavor to collect the Receivables and reduce them to cash and, following the Closing, implement procedures for the effective collection of Receivables of the Pre-Petition Lender.

24. In addition to the Receivables, the Debtors intend to market other assets not included in the Sale Agreement, consisting of other machinery, furniture, fixtures, equipment and

---

[3] James Nicholas, David Jurist, Eric Bernstein and Gerry Ritterman may be entitled to share in a bonus pool based upon a percentage of one year net revenues on a sliding scale of 1% for one year net revenues of $15,000,000 and above up to 3 ¼ % of one year net revenues of $60,000,000 and above. Finally, those individual may be entitled to share in a bonus of $500,000 if the initial 12 month net revenues exceed $40,000,000.

[4] Union Graphics, Inc. is a guarantor of the Purchaser's obligations under the Sale Agreement and the ultimate parent of the Purchaser.

inventory (the "Other Tangible Assets") simultaneously with the marketing efforts for the sale of the Assets in the content of the Sale Motion. As noted above, the Debtors, through their financial advisors, Getzler Henrich, will endeavored to identity alternative offers for the Asset to be made in accordance with the Bid Procedures. Additionally, the Debtors intend to retain Daley-Hodkin LLC ("Daley-Hodkin") to assist the Debtors in marketing (a) the machinery and equipment included in the Assets and subject to the Sale Agreement as well as (b) the Other Tangible Assets for sale at auction.[5] The Debtors believe that simultaneous marketing of the machinery and equipment included in the asset sale and the Other Tangible Assets will maximize the overall property of the estates.

25. Finally, the Debtors are also parties to executory contracts that are not Assets under the Sale Agreement and which will be analyzed and assumed or rejected, as appropriate.

### THE SALE IS SUPPORTED BY SOUND BUSINESS JUDGMENT AND SHOULD BE APPROVED

26. The Debtors submit that the terms of the Sale Agreement are fair and reasonable, and that ample authority exists for the approval of the sale of the Assets to the Purchaser. Section 363(b) of the Bankruptcy Code provides that a debtor-in-possession, after notice and a hearing, may use, sell, or lease property of the estate other than in the ordinary course of business. In pertinent part, the section provides:

> (b)(1) The trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

*See* 11 U.S.C. § 363(b)(1).

27. In order for a court to approve a request for the use of property of the estate outside the ordinary course of business, the court must find that the proposed course of action is supported by sound business reasons. *See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.),*

---

[5] The Debtors intend to file a separate application for the retention of Daley-Hodkin and for authority to sell the Other Tangible Assets at auction.

722 F.2d 1063, 1071 (2nd Cir. 1983); *see also In re Chateaugay Corp.,* 973 F.2d 141 (2d Cir. 1993); *Bartel v. Bar Harbor Airways, Inc.,* 196 B.R. 268, 273 (S.D.N.Y. 1996); *In re Caldor, Inc.- NY,* 193 B.R. 182, 187 (Bankr. S.D.N.Y. 1996); *In re Thomas McKinnon Securities, Inc.,* 120 B.R. 301 (Bankr. S.D.N.Y. 1990). In reviewing such proposed transactions, courts should give substantial deference to the business judgment of the debtor-in-possession. *See e.g., Esposito v. Title Inc. Co. of Pa. (In re Fernwood Mkts.),* 73 B.R. 616, 621 n.2 (Bankr. E.D. Pa. 1987).

28. The Debtors submit that consideration of these factors militates in favor of this Court's approval of a section 363(b) sale process. Prior to the Petition Date, the Debtors canvassed the marketplace for potential investors and/or acquirers for all or a portion of the business. Because no party has been willing to invest in the business, the Debtors have determined that they are unable to promulgate a plan of reorganization on a stand-alone basis. Although the Debtors' believe they have sufficient funds to continue to operate pending the Sale Hearing, the Debtors are concerned that unless they are permitted to undertake an asset sale at this time they will lose the value of their assets, in particular, its name recognition and good will in the industry that has been developed over the past century. Accordingly, the Debtors believe that conducting an auction sale process will maximize the prospect of a sale of the Assets on a going concern basis. Thus, approval of the Sale Agreement provides the Debtors the ability to maximize the value of its assets through a fair and open auction process.

29. Based upon the foregoing, the Debtors submit that the Sale Agreement and the proposed sale of the Assets is in the best interests of the Debtors, their estates, and their creditors, and is based upon sound, reasoned and informed business judgment warranting this Court's approval. *See In re Lionel Corp.,* 722 F.2d at 1071; *Bar Harbor Airways, Inc.*, 196 B.R. at 273; *In re Caldor, Inc. - NY*, 193 B.R. at 187.

30. The Debtors and the Purchaser seek findings that the transactions contemplated by the Sale Agreement are (a) subject to the protections afforded to "good faith" purchasers under section

363(m) of the Bankruptcy Code and (b) not subject to avoidance under section 363(n) of the Bankruptcy Code. Section 363(m) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under section (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

*See* 11 U.S.C. § 363(m). In addition, section 363(n) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount . . . [including] punitive damages . . . .

11 U.S.C. § 363(n).

31. The negotiations and the resulting transaction contemplated by the Sale Agreement are the result of good faith and arm's length negotiations between the Debtors and the Purchaser and resulted in a Purchase Price that is both fair and reasonable in light of the circumstances. At the Sale Hearing, the parties will adduce evidence in support of the foregoing and will request that the Court incorporate findings on these matters as part of the Order approving the sale.

### THE SALE SHOULD BE APPROVED FREE AND CLEAR OF ALL LIENS AND ENCUMBRANCES

32. Pursuant to section 363(f) of the Bankruptcy Code, after notice and a hearing, a debtor may sell property of the estate free and clear of all liens and encumbrances. In pertinent part, the section provides:

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if-

(1) applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which the property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Here, the Pre-Petition Lender has agreed to the sale of the Core Assets (as defined in the Sale Agreement).

## BIDDING PROCEDURES

33. The Debtors and the Purchaser recognize that the sale of the Assets must be subject to higher and better offers pursuant to applicable bankruptcy law. The Purchaser is prepared to consent to subject its offer to higher and better bids provided it receives overbid protection and the Court approves the Break-Up Fee and an Expense Reimbursement, and appropriate bidding procedures are put in place. Set forth below are the proposed Bidding Procedures to be employed with respect to the Auction (if any):

   a. <u>Alternative Bid Deadline</u>. All alternative bids must be submitted to the Debtors, c/o their bankruptcy counsel, Halperin Battaglia Raicht, LLP, 555 Madison Avenue, 9th Floor, New York, New York 10022, Attn: Robert D. Raicht, Esq. and Julie D. Dyas, Esq. by a date fixed by the Bankruptcy Court (the "<u>Alternative Bid Deadline</u>").

   b. <u>Due Diligence</u>. To the extent any proposed bidder wants to undertake any due diligence with respect to the Assets, such proposed bidder must execute a non-disclosure agreement (to the extent such an agreement has not been previously executed and delivered by such proposed bidder) in form and substance acceptable to the Debtors prior to undertaking any such due diligence and all such due diligence must be undertaken and completed prior to the Alternative Bid Deadline.

   c. <u>Qualified Bid</u>. Only alternative bids that meet with the following qualifications will be considered a "<u>Qualified Bid</u>" by the Debtors:

i. the bid must be <u>received</u> by the Debtors' bankruptcy counsel, Halperin Battaglia Raicht, LLP, 555 Madison Avenue, 9th Floor, New York, New York 10022, Attn: Robert D. Raicht, Esq. and Julie D. Dyas, Esq., by the Alternative Bid Deadline; and

ii. The bid must be accompanied by a down payment deposit in immediately available funds of no less than ten (10%) percent of the proposed purchase price and by a duly executed sale agreement, substantially similar to the Sale Agreement and marked to reflect variations thereto, but in no event shall such sale agreement be less favorable to the estate than the terms of the Sale Agreement. The deposit will be non-refundable if the bidder is selected as Successful Bidder (as defined below) and fails to consummate the purchase (other than as a result of a breach by the Debtors). The deposit will be refundable if the bidder is not selected as the Successful Bidder.

iii. The proposed purchase price for a Qualified Bid shall be an amount in cash of at least the sum of (A) the Purchase Price as defined in the Sale Agreement (the "<u>Stalking Horse Bid</u>"), <u>plus</u> (B) the amount of the Break-Up Fee and Expense Reimbursement (i.e., $75,000, if the bid includes the Core Assets and $37,500 if the bid does not include the Core Assets), <u>plus</u> (C) $25,000 (the "<u>Subsequent Incremental Bid Amount</u>")((A), (B) and (C), collectively, the "<u>Initial Overbid</u>"). In the event a bidder (including Purchaser) is the second best bidder (the "<u>Back-Up Bidder</u>"), its bid shall be irrevocable and such bidder shall remain ready, willing and able to purchase the Assets through the closing of the transaction with the successful bidder.[6]

iv. Without limiting the generality of the foregoing, such bid shall be for the Assets and any liabilities to be assumed under the Sale Agreement on an as-is, where-is basis and shall not include any due diligence, financing or other contingency.

v. The bid must be expressly made subject to the Debtors' obligations to pay the Break-Up Fee and the Expense Reimbursement pursuant to the terms of the Sale Agreement.

vi. Simultaneously with the delivery of the down payment deposit and the executed Sale Agreement, an entity submitting an alternative bid shall deliver financial information to Debtors' counsel evidencing that such party has the financial wherewithal to consummate the proposed transaction on the terms proposed. Such financial information may include current audited or verified financial statements and/or a letter from a depository institution indicating the ability to close on a proposed transaction. In the event the financial information pertains

---

[6] With respect to the Purchaser, the obligation to serve as the Back-Up Bidder (including posting the escrowed deposit) terminates on the Outside Date (as defined in the Sale Agreement) (*i.e.*, 14 days of entry of the Sale Order).

to the parent corporation of an acquisition affiliate, the bid of the affiliate shall be guaranteed by the parent.

vii. The entity submitting an alternative bid shall also provide evidence or affirm under oath that all necessary approvals have been obtained authorizing the submission of the bid by such entity.

viii. Only those bids bidders having submitted Qualified Bids (a "Qualified Bidder") will be permitted to participate in the Auction. The Debtors will promptly notify each alternative bidder after the Alternative Bid Deadline whether it is a Qualified Bidder.

d. Auction Procedures and Bidding Increments.

i. At the Auction (A) all bids shall be made and received in one room, on an open basis, and all other bidders shall be entitled to be present for all bidding with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each bid will be fully disclosed to all other bidders throughout the entire Auction; (B) the opening bid at the Auction shall not be less than the Initial Overbid; (C) all offers subsequent to the opening bid at the Auction (*i.e.*, the Subsequent Incremental Bid Amount) must exceed the prior offer by not less than $25,000; (D) with respect to any such further overbid submitted by the Purchaser, the consideration offered by the Purchaser shall be deemed to include the full amount of the Break-Up Fee and Expense Reimbursement potentially payable to the Purchaser; and (E) bidding at the Auction will continue until such time as no further bids are made within the time limit announced by the Debtors;

ii. The Auction will be conducted openly and each Qualified Bidder will be informed of the terms of the previous bid;

iii. Upon conclusion of the Auction, the Debtors shall determine the highest or otherwise best bid (the "Successful Bidder"), and such bid shall be submitted for approval by the Bankruptcy Court;

iv. The Successful Bidder shall have the burden of establishing by competent evidence that it qualifies for section 363(m) protections;

v. If the Debtors do not receive any Qualified Bids, the Debtors will report the same to the Bankruptcy Court and will proceed with the Sale Hearing and no Auction shall be held;

vi. The Pre-Petition Lender shall not have the right to credit bid with respect to the Core Assets; however, with respect to the remainder of the Assets the Pre-Petition Lender is deemed to be a Qualified Bidder

and shall have the right to credit bid in accordance with applicable bankruptcy and non-bankruptcy law, and such credit bid rights will not be abridged in any respect by these Bidding Procedures including, without limitation, any requirement that the Pre-Petition Lender comply with any incremental bid amounts, initial bid amounts, any qualifying bid requirements, whether in form, amount or timing; except, however, that the Pre-Petition Lender must bid in accordance with the Subsequent Incremental Bid Amount to the extent a Qualified Bidder other than Purchaser has met the Initial Overbid.

vii. The Debtors reserve the right to establish such other reasonable rules and procedures for the conduct of the Auction, provided that such rules and procedures are publicly announced at the Auction.

e. <u>Break-Up Fee/Expense Reimbursement</u>. A Break-Up Fee and Expense Reimbursement shall be payable to Purchaser under the following terms and conditions:

i. If a person other than the Purchaser is determined to be the Successful Bidder for the Core Assets and the Debtors close on a competing sale with respect to such a transaction, the Purchaser shall receive the Break-Up Fee in the amount of $50,000 and shall be entitled to an Expense Reimbursement in an amount not to exceed $25,000, representing Purchaser's reasonable documented out-of-pocket expenses incurred in connection with this transaction, also as described more fully in the Sale Agreement.

ii. If the Purchaser is determined to be the Successful Bidder for the Core Assets, but a person other than the Purchaser is determined to be the Successful Bidder for the Assets other than the Core Assets and the Debtors close on a competing sale with respect to such a transaction, the Purchaser shall receive the Break-Up Fee in the amount of $25,000 and shall be entitled to an Expense Reimbursement in an amount not to exceed $12,500, representing Purchaser's reasonable documented out-of-pocket expenses incurred in connection with this transaction, also as described more fully in the Sale Agreement.

iii. The Break-Up Fee shall be accorded treatment as a superpriority claims in the Chapter 11 cases, senior to all other superpriority claims, except for liens granted under any orders approving the Interim Support Production Agreement and the Cash Collateral Motion.

iv. The Break- Up Fee and Expense Reimbursement shall be paid to Purchaser upon the closing of a competing bid approved by the Bankruptcy Court and in cash by the Pre-Petition Lender if it successfully credit bids for any of the Assets.

## THE BIDDING PROCEDURES ARE
## REASONABLE AND SHOULD BE APPROVED

34. Bankruptcy Rule 6004(f)(1) provides that a sale of property outside of the ordinary course of business may be by private sale or public auction. The Debtors believe that subjecting the Offer to higher or better bids will ensure the maximization of the value of the Assets. The Debtors submit that the Bidding Procedures are fair and reasonable and should be approved. They afford the Debtors the opportunity to subject the Assets to competitive bidding while preserving the Purchaser as a stalking horse bidder and thereby providing a floor price for the Assets.

35. The Bidding Procedures will also ensure that the Sale Hearing is conducted in a fair and orderly manner, and that participants are *bona fide* bidders with ability and desire to consummate any proposed transaction. The Initial Overbid will ensure that the competitive bidding process compensates the Debtors for the cost of the Break-Up Fee and permits the Debtors to derive an added economic benefit from any such bids. The Subsequent Incremental Bid Amount reflects a fair and reasonable increment that should encourage competitive bidding and ensure that there is a true economic benefit to the Debtors and their estates for each successive bid.

36. The Break-Up Fee and the Expense Reimbursement are intended to compensate the Purchaser for its out of pocket expenses, the time expended by its staff in connection with the pursuit of this transaction, and as an incentive for the Purchaser to serve as the Debtors' stalking horse bidder and subject the Assets to competitive bidding. Here, the amount of the Break-Up Fee and the Expense Reimbursement is dependent upon whether Purchaser acquires the Core Assets, as opposed to an alternate Successful Bidder. As discussed above, the Purchaser would be entitled to a Break-Up Fee and Expense Reimbursement of $50,000 and up to $25,000, respectively, if the Purchaser is not the Successful Bidder as to the Core Assets, but a reduced Break-Up Fee and Expense Reimbursement of $25,000 and up to $12,500, respectively, if the Purchaser is the Successful Bidder as to the Core Assets, but a different Successful Bidder acquires the Assets other than the Core Assets. The structure of the Break-Up Fee and

Expense Reimbursement is the result of good faith, arm's length negotiation among the parties. *See In re: Integrated Resources, Inc.,* 147 B.R. 650, 658 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2nd Cir. 1993); *In re: 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (Break-up fee which is the result of good faith, arm's length agreement and not tainted by self-dealing should be upheld).

37. In the instant case, the proposed Break-Up Fee is a fair and reasonable in relation to the proposed Purchase Price in light of the funds and efforts expended by the Purchaser to consummate this transaction. The Expense Reimbursement is also designed to compensate the Purchaser but is subject to reasonableness and shall not exceed $25,000. The Debtors submit that the Expense Reimbursement is a reasonable and appropriate protection for the Purchaser as it serves to move the process forward. Accordingly, the Debtors respectfully request that this Court enter an order approving the Break-Up Fee, the Expense Reimbursement and Bidding Procedures in the form annexed as Exhibit C to the Sale Agreement.

### THE DEBTORS REQUEST THAT THE COURT SCHEDULE THE SALE HEARING AND FIX THE MANNER AND NOTICE OF SAME

38. The purpose of the Sale Hearing is to approve the sale of the Assets to the Purchaser, or such other bidder as may tender a higher or better offer at the Auction. Nevertheless, the Debtors respectfully request that the Sale Hearing be scheduled at the earliest possible time. Bankruptcy Rule 2002(a)(2) provides for twenty (20) days' notice of a "proposed use, sale or lease of property of the estate other than in the ordinary course of business . . . ." Thus, it is requested that the Court schedule the Auction and Sale Hearing during the week of October 19, 2009. The Debtors submit that such relief is reasonable and appropriate under the circumstances.

39. The Debtors propose that a true and complete copy of the proposed pre-fixed Order Scheduling Hearing, this Motion, together with all exhibits be served upon: (a) counsel to the Purchaser, (b) HSBC, by its counsel (c) all entities known to assert a lien, claim, interest or encumbrance in

the Debtors' assets; (d) the twenty (20) largest creditors of each of the Debtors; (e) the United States Attorney's Office for the Southern District of New York; (f) all parties that have previously expressed interest in acquiring all or a portion of the Debtors' assets; and (g) the Office of the United States Trustee.

40. The Debtors further request that the Court approve the form of notice annexed as **Exhibit B** hereto (the "Notice"). The Debtors propose to serve a copy of the Notice upon (a) all known creditors of the Debtors; (b) all federal, state and local taxing authorities in which the Debtors operate businesses; and (c) all parties that have filed a notice of appearance in these cases.

## NO PREVIOUS REQUEST

41. No previous application for the relief sought herein has been made by the Debtors to this or and other court.

(Remainder of Page Intentionally Blank)

**WHEREFORE,** the Debtors respectfully requests that this Court enter (a) the pre-fixed Order Scheduling Hearing (i) fixing the date and time of a Sale Hearing to consider approval of the Sale; (ii) fixing the date and time of the Bidding Procedures Hearing to consider approval of the Break-Up Fee, the Expense Reimbursement and Bidding Procedures for the conduct of an Auction and entering orders thereon, and (iii) fixing the manner and form of notice of the Sale Hearing; (b) the Bidding Procedures Order in the form annexed as Exhibit C to the Sale Agreement; and (c) enter an Order, in the form attached hereto as **Exhibit C**, authorizing the sale of the Debtors' Assets pursuant to sections 105(a), 363(b), (f), (m) and (n) of the Bankruptcy Code and Bankruptcy Rule 2002, 6004, and (d) for such other and further relief as this Court deems just and proper.

Dated: New York, New York
September 11, 2009

**TANA SEYBERT LLC, COUSINS PRINTING LLC, CREATIVE PRINT SERVICES LLC, & PRINTELLIGENCE, LLC.**
Debtors and Debtors-in-Possession

By: */s/ Eric Bernstein*
Eric Bernstein
President of Tana Seybert LLC, Cousins Printing LLC and Printelligence, LLC
Vice President of Creative Print Services LLC

**HALPERIN BATTAGLIA RAICHT, LLP**
Proposed Counsel to the
Debtors and Debtors-in-Possession

By: */s/ Robert D. Raicht*
Alan D. Halperin, Esq.
Robert D. Raicht, Esq.
Julie D. Dyas, Esq.
555 Madison Avenue, 9th Floor
New York, NY 10022
(212) 765-9100